UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD THOMAS FOX,<br><br>    Plaintiff,<br><br>    v.<br><br>SOCIAL SECURITY ADMINISTRATION,<br><br>    Defendant.<br>_____/ | No. C-05-3930 EMC<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT, AND REMANDING FOR ADDITIONAL PROCEEDINGS**<br><br>**(Docket Nos. 15, 18)** |

       On July 22, 2003, Plaintiff Richard Thomas Fox filed an application for supplemental security income ("SSI") benefits under Title XVI of the Social Security Act ("Act"). The application was denied initially on September 16, 2003, and again after a request for reconsideration, after which Mr. Fox requested a hearing before an administrative law judge ("ALJ"). A hearing was held before an ALJ on October 22, 2004. Subsequently, on February 18, 2005, the ALJ issued his decision, concluding that Mr. Fox was not disabled under the Act.

       Mr. Fox has exhausted his administrative remedies with respect to his claim of disability. This Court has jurisdiction for judicial review pursuant to 42 U.S.C. § 405(g). Mr. Fox has moved for summary judgment or, in the alternative, for a remand for additional administrative proceedings on whether he was disabled. The Commissioner has cross-moved for summary judgment. Having considered the parties' briefs and accompanying submissions, including but not limited to the administrative record, and good cause appearing therefor, the Court hereby **DENIES** both motions for summary judgment but **REMANDS** the case for further proceedings consistent with this order.

## I. FACTUAL & PROCEDURAL BACKGROUND

Mr. Fox applied for SSI benefits on July 22, 2003. *See* AR 55-58. In his application, he alleged disability as of September 1, 1999. *See* AR 55. The claimed disabilities as listed on Mr. Fox's disability report were bipolar disorder and dementia. *See* AR 83 (alleging that these illnesses affect his concentration and ability to work with people). The application for benefits was denied initially on September 16, 2003. *See* AR 26. After a request for reconsideration, *see* AR 32-33, the application was again denied on February 9, 2004. *See* AR 27. Thereafter, Mr. Fox asked for a hearing before an ALJ, *see* AR 41-42, which took place on October 22, 2004. *See* AR 372-437.

On December 14, 2004, the ALJ issued his decision, concluding that Mr. Fox was not "disabled" under the Act. *See* AR 14-25. In reaching this decision, the ALJ undertook the five-step sequential evaluation process for disability required under 20 C.F.R. § 416.920.

> Step one disqualifies claimants who are engaged in substantial gainful activity from being considered disabled under the regulations. Step two disqualifies those claimants who do not have one or more severe impairments that significantly limit their physical or mental ability to conduct basic work activities. Step three automatically labels as disabled those claimants whose impairment or impairments meet the duration requirement and are listed or equal to those listed in a given appendix. Benefits are awarded at step three if claimants are disabled. Step four disqualifies those remaining claimants whose impairments do not prevent them from doing past relevant work. Step five disqualifies those claimants whose impairments do not prevent them from doing other work, but at this last step the burden of proof shifts from the claimant to the government. Claimants not disqualified by step five are eligible for benefits.

*Celaya v. Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003).

At step one, the ALJ found that, "giving [Mr. Fox] the benefit of the doubt, [there was] no evidence that [he] has engaged in substantial gainful activity at any time since his alleged disability onset date." AR 15.

At step two, the ALJ concluded that "[Mr. Fox] has had the medically determinable severe impairments of polysubstance dependence and alcohol disorder, in reported remission, and bi-polar disorder," which "have significantly limited [his] ability to perform basic work activities." AR 15.

Under step three, these impairments were "not 'severe' enough to meet or medically equal, either singly or in combination to one of the impairments listed in Appendix 1, Subpart P,

2

Regulations No. 4." AR 18; *see also* AR 19 (noting that "[Mr. Fox's] impairments were also assessed . . . within the parameters of Section 12.09 of the Listings").

At step four, the ALJ concluded that, discounting the effects attributable to Mr. Fox's drug and alcohol dependence disorder, Mr. Fox had a residual functional capacity ("RFC") with no exertional limitations "other than perhaps, normal seizure precautions" but with certain nonexertional limitations – *i.e.*, "restrict[ion] to simple repetitive tasks with less than occasional contact with the general public as daily work activity." AR 19. This RFC determination was based on, or at least took into account, Mr. Fox's compliance with medications. *See* AR 20 ("[W]hen [Mr. Fox] is compliant with medications and abstinent from alcohol and illegal drugs, [he] is capable of self-care and of performing simple repetitive tasks."). The ALJ further determined, at step four, that Mr. Fox has no past relevant work. *See* AR 23.

Finally, at step five, the ALJ concluded that "[Mr. Fox's] ability to perform (simple, repetitive) work at all exertional levels is not significantly compromised by [his] non-exertional limitations and using Section 204.00 of the Medical-Vocational Guidelines as a framework for decision-making, [Mr. Fox] is '*not* disabled.'" AR 24 (emphasis in original). The ALJ also found that "there are a significant number of jobs in the national economy that [Mr. Fox] can perform given [his] age, education, past relevant work experience, and residual functional capacity." AR 24.

In his motion for summary judgment or, in the alternative, for remand, Mr. Fox raises five arguments: (1) that the ALJ improperly discounted the opinions of treating sources and Mr. Fox's parole agent; (2) that the ALJ improperly discounted Mr. Fox's credibility; (3) that the ALJ improperly applied the law about substance abuse; (4) that the ALJ improperly applied the law about noncompliance with medical treatment; and (5) that the ALJ's finding on RFC, as well as his findings at step five, were not supported by substantial evidence. Each argument is addressed below.

## II. DISCUSSION

A. Legal Standard

The district court may disturb the final decision of the Social Security Administration "only if it is based on legal error or if the fact findings are not supported by substantial evidence."

3

*Sprague v. Bowen*, 812 F.2d 1226, 1229 (9th Cir. 1987). "Substantial evidence, considering the entire record, is relevant evidence which a reasonable person might accept as adequate to support a conclusion." *Matthews v. Shalala*, 10 F.3d 678, 679 (9th Cir. 1993). Substantial evidence means "more than a mere scintilla, but less than a preponderance." *Young v. Sullivan*, 911 F.2d 180, 183 (9th Cir. 1990) (internal quotation marks omitted). The court's review "must consider the record as a whole," both that which supports as well as that which detracts from the Secretary's decision. *Desrosiers v. Secretary of Health & Hum. Servs.*, 846 F.2d 573, 576 (9th Cir. 1988). "If the evidence admits of more than one rational interpretation, [the court] must uphold the decision of the ALJ." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984).

B.   Opinions of Treating Physicians and Parole Agent

1.   Opinions of Treating Physicians

"Cases in [the Ninth] [C]ircuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians). As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). When the opinion of a treating physician is not contradicted by that of another physician, then the treating physician's opinion may be rejected for clear and convincing reasons only. *See id.* If, however, the treating physician's opinion is contradicted, then it may be rejected for "'specific and legitimate reasons' supported by substantial evidence in the record." *Id.* "The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of . . . a treating physician." *Id.* at 831.

In the instant case, Mr. Fox argues that the ALJ improperly discounted the opinions of two of his treating sources, namely, Anita Gilbert, PhD, and James Dotson, MD. *See* AR 216-18 (evaluation by Dr. Gilbert, dated October 16, 2003); AR 326-27 (letter from Dr. Gilbert, dated August 30, 2004); AR 341-52 (psychiatric review technique by Dr. Gilbert, dated November 9, 2004); AR 353 (letter from Dr. Dotson, undated); AR 370 (statement by Dr. Dotson, dated November 9, 2004, stating that he agrees with contents of Dr. Gilbert's letter of August 30, 2004).

Because the opinions of Dr. Gilbert and Dr. Dotson were contradicted – *e.g.*, by Gary Balestin, PhD, *see* AR 219-25 (report of psychological examination by Dr. Balestin, dated July 17, 2004), and John Dusay, MD, *see* AR 328-37 (psychiatric review technique by Dr. Dusay, undated) – the less demanding standard is applicable. That is, the ALJ was entitled to reject the opinions of Dr. Gilbert and Dr. Dotson so long as he gave specific and legitimate reasons, supported by substantial evidence in the record, for doing so.

In his decision, the ALJ accorded less weight to the "more restrictive opinions submitted by Dr. Gilbert" because they were "inconsistent with the medical signs and laboratory findings such as the ongoing treatment notes." AR 20. For the same reason, the ALJ also accorded less weight to certain (but not all) opinions by Dr. Dotson – more specifically, those "more restrictive reports" that were written "upon apparent encouragement from Dr. Gilbert." AR 20. The ALJ explained that, because the more restrictive opinions of Dr. Gilbert and Dr. Dotson contradicted the "actual treatment notes" (including the treatment notes of Dr. Dotson), they suggested "advocacy, and are therefore, less than fully credible." AR 22. The ALJ gave more weight instead to the treatment notes (including those of Dr. Dotson and P.T. Wilson, MD), the opinions of Dr. Dusay (a nonexamining physician who testified as a medical expert at the hearing before the ALJ), and the opinions of Dr. Balestin (an examining psychologist). *See* AR 18, 20, 22.

The Court concludes that the ALJ did give specific and legitimate reasons for giving less weight to the opinions of Dr. Gilbert and specific opinions of Dr. Dotson, supported by substantial evidence in the record. In particular, the treatment notes from treating sources other than Dr. Gilbert indicate that Mr. Fox was improving and/or doing well. For example, on or about August 21, 2003 (*i.e.*, shortly after Mr. Fox filed his application for SSI benefits), Joe Broderick, MD, conveyed his belief that "[Mr. Fox] is taking his meds as prescribed and decided to increase the Seroquel from TID to QID & the Klonopin from BID to TID. He noticed the benefit to the patient today." AR 159 (treatment note, dated August 22, 2003); *see also* AR 238-39 (treatment note by RN, dated August 21, 2003) (noting, *inter alia*, "No evidence of delusions, etc. presently"; intact memory (both recent and remote); and good impulse control, judgment, and insight). From August 2003 to March 2004, treatment notes from Dr. Wilson reflect that Mr. Fox was showing no psychotic signs, that Mr. Fox

was participating in community activities, and that overall Mr. Fox was doing well, feeling better, and/or stable. *See* AR 363-69.

Dr. Dotson's treatment notes from April 2004 to November 2004, likewise reflect that Mr. Fox was improving and/or doing well. *See* AR 355-62 (noting that Mr. Fox was alert, that his speech was generally logical, that his mood symptoms were generally not significant, and that his bipolar disorder was generally stable). While Dr. Dotson did opine for the first and only time on November 9, 2004, that Mr. Fox's "irritability and temper were still present to an extent that he could not hold down a job," even then Dr. Dotson still stated that the medications were "helpful" and that Mr. Fox's bipolar disorder was "improved on meds." AR 355 (although adding that "only functions due to limited contact with people and situations that are likely to challenge him").

Dr. Balestin's evaluation of Mr. Fox in July 2004 is largely in accord with the above treatment notes. Based on his examination of Mr. Fox, Dr. Balestin stated that:

> Mr. Fox was oriented to person, place, time and situation. Eye contact was consistent, appropriate, and well maintained. Mr. Fox's expressive and receptive language pragmatics [pitch, stress, intonation, articulation, phraseology, productivity, conversational style, metalanguage, MLUs, prosody] were average. . . . Mr. Fox in general was able to follow the pace of the session. Frustration tolerance was low average. . . . Effort and attention were average.

AR 219. Based on test results as well as clinical impressions, Dr. Balestin also determined that most of Mr. Fox's abilities to function in a work environment were good or fair, with only a poor notation for the ability to "[a]dapt to stress in job situation." AR 224. Dr. Balestin concluded: "Prognosis is guarded. Mr. Fox stated that he has difficulty with impulse control and that he is able to maintain his composure as long as he takes his medication. It is unclear how compliant he is or will continue to be with his medication." AR 224.

Dr. Dusay, the nonexamining physician who testified at the ALJ hearing, essentially endorsed the opinion of Dr. Balestin – *i.e.*, that, when on his medications and not abusing substances, Mr. Fox's limitations were moderate. *See* AR 420-26. Dr. Balestin and Dr. Dusay's opinions were in turn consistent with the opinion of a state agency physician provided in September 2003. That physician, Dr. Robert Lee, concluded that Plaintiff "is mentally capable of sustained

simple work with limited public, coworker and supervisor interactions." *See* AR 203-06 (mental RFC assessment by Robert Lee, psychological consultant for state agency, dated September 10, 2003).

Mr. Fox argues still that, in spite of the above, the ALJ was not entitled to discount Dr. Gilbert and Dr. Dotson's opinions as mere advocacy. *See Reddick v. Chater*, 157 F.3d 715, 726 (9th Cir. 1998) ("[I]n the absence of other evidence to undermine the credibility of a medical report, the purpose for which the report was obtained does not provide a legitimate basis for rejecting it."). It is true that the ALJ used the word advocacy to describe Dr. Gilbert's opinions. *See* AR 22. The ALJ also suggested that some of Dr. Dotson's opinions were advocacy because they were provided only after Dr. Dotson was admonished by Dr. Gilbert. *See* AR 22. Furthermore, Dr. Dusay, whose opinion the ALJ endorsed, called a letter submitted by Dr. Gilbert an advocacy report because Dr. Gilbert wrote the letter only after counsel for Mr. Fox gave her a copy of Dr. Balestin's report and asked her to respond to the report. *See* AR 416-17. The problem for Mr. Fox is that, in spite of these facts, the primary reason for the ALJ's decision to accord less weight to the opinions of Dr. Gilbert and Dr. Dotson was the conflict between their opinions and the treatment notes.

In his motion, Mr. Fox argues that there was no such inconsistency between Dr. Gilbert and Dr. Dotson's opinions and the treatment notes:

> The opinions focused on [Mr. Fox's] inability to 'sustain gainful employment' due to anxiety, manic or anxious behavior and irritability when under pressure. The clinic notes did not provide evidence that [Mr. Fox's] anxiety was abated. The clinic environment did not provide an environment in which to observe this. The clinic notes about improvement or stability during periods of not working were not inconsistent with the opinions.

Mot. at 4; *see also* AR 355 (treatment note by Dr. Dotson, dated November 9, 2004) ("Bipolar, improved on meds. But only functions due to limited contact with people and situations that are likely to challenge him.").

These arguments are unavailing. First, it is true that a clinic environment is not the same as a work environment but that does not mean that assessments based on behavior in a clinic environment should therefore be rejected entirely or discounted. In fact, that would be contrary to case law which emphasizes the importance of information provided by treating sources. Second,

while the treatment notes in the instant case do not say, *e.g.*, that Mr. Fox no longer had *any* anxiety or irritability, they do indicate that Mr. Fox was improving and/or doing well and further suggest that Mr. Fox was able to exert some control over his emotions or moods. *See, e.g.*, AR 238-39 (treatment note by RN, dated August 21, 2003) (noting, *inter alia*, good impulse control, judgment, and insight); AR 355-62 (treatment notes by Dr. Dotson from April 2004 to November 2004) (noting that Mr. Fox's mood symptoms were generally not significant); AR 224 (evaluation by Dr. Balestin in July 2004) (noting that "Mr. Fox stated that he has difficulty with impulse control and that he is able to maintain his composure as long as he takes his medication"). That such emotions or moods would be difficult to control in stressful situations was a fact implicitly acknowledged by Dr. Dotson, *see* AR 356 ("I reviewed the importance of sleep and avoiding stressors as much as possible so that he did not become revved up into a manic state."), as well as Dr. Balestin. *See* AR 224 (noting that Mr. Fox's ability to "[a]dapt to stress in job situation" was poor). It was also acknowledged by the ALJ, who concluded that Mr. Fox did have certain nonexertional limitations because of his mental impairments, *i.e.*, "restrict[ion] to simple repetitive tasks with less than occasional contact with the general public as daily work activity." AR 19; *see also* AR 203-06 (mental RFC assessment by Robert Lee, psychological consultant for state agency, dated September 10, 2003) (concluding that plaintiff "is mentally capable of sustained simple work with limited public, coworker and supervisor interactions"). The ALJ took all material facts into account.

Accordingly, the Court concludes that the ALJ gave specific and legitimate reasons, supported by substantial evidence in the record, for giving less weight to the opinions of Dr. Gilbert and Dr. Dotson.

### 2. Opinions of Parole Agent

Mr. Fox argues that not only did the ALJ improperly discount the opinions of Dr. Gilbert and Dr. Dotson but that the ALJ also improperly discounted the opinions of his parole agent, D. Farinas. *See* AR 131-32. Mr. Farinas was Mr. Fox's parole agent since January 29, 2003. *See* AR 131. In a letter, dated November 8, 2004, Mr. Farinas stated, *inter alia*, that, "[a]lthough Mr. Fox is able to do some work [*e.g.*, cutting trees with his sponsor, owner of Mountain Man Wood Co., and doing miscellaneous chores as volunteer work for his church], most of the work made available [was]

through his close ties, who were aware of Mr. Fox's health issues. I believe Mr. Fox would not be suitable to any stable work environment." AR 131. Mr. Farinas further stated: "As long as Mr. Fox remains in good company, with a strong, caring support group, sobriety may be achieved. Under the care of his doctor, mental health issues should be addressed with prescribed medication. However, I believe life will be a daily battle for Mr. Fox." AR 132. In his decision, the ALJ did not make any comment about these or any other opinions offered by Mr. Farinas.

The Ninth Circuit has held that "lay witness testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence, and therefore cannot be disregarded without comment." *Van Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (emphases omitted); *see also* 20 C.F.R. § 416.913(d)(4) (noting that, in addition to evidence from acceptable medical sources, "we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work," including "non-medical sources (for example, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy)"). The ALJ therefore erred in failing to address the opinions of Mr. Farinas.

The only question remaining is whether the ALJ's error was harmless. The Ninth Circuit has "recognize[d] [that] harmless error applies in the Social Security context." *Stout v. Commissioner, Social Security Administration*, 454 F.3d 1050, 1054 (9th Cir. 2006). "[W]here the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." *Id.* at 1055; *see also Robbins v. Social Security Administration*, 466 F.3d 880, 885 (9th Cir. 2006) (also noting that the Ninth Circuit has "never found harmless an 'ALJ's silent disregard of lay testimony about how an impairment limits a claimant's ability to work'"). Therefore, the question for this Court is whether, fully crediting Mr. Farinas's opinions, a reasonable ALJ could have reached a disability determination different from that reached by the ALJ in the instant case.

The Court concludes that a reasonable ALJ could have reached a different determination Mr. Farinas indicated that Mr. Fox was able to do work only because he had close relationships with his employers (*i.e.*, sponsor, church) and his employers were aware of and took into account his mental

impairments. Fully crediting this evidence, a reasonable ALJ could give more credence to Dr. Dotson's opinion that, although Mr. Fox's bipolar disorder was improved on medications, Mr. Fox "only functions due to limited contact with people and situations that are likely to challenge him," AR 355, *see also* SSR 06-03p (noting that regulations "require[] adjudicators to consider any other factors brought to our attention, or of which we are aware, which tend to support or contradict a medical opinion" and that opinions of nonmedical sources "can be important in this regard"), and thus could find a mental RFC even less than that found by the ALJ in the instant case appropriate – *i.e.*, that even "restrict[ion] to simple repetitive tasks with less than occasional contact with the general public as daily work activity," AR 19, would not be enough. *Cf. Stout*, 454 F.3d at 1055 (concluding that ALJ's error was not harmless because, "[i]f fully credited, the lay testimony supports a conclusion that [the plaintiff's] mental impairments render him in need of a special working environment which, particularly when considering the VE's testimony, a reasonable ALJ could find precludes [the plaintiff] from returning to gainful employment").

Accordingly, the Court finds that a remand is appropriate based on the prejudicial error of the ALJ in failing to address the opinions of Mr. Farinas. This is not to say that, on remand, the ALJ in the instant case or another ALJ cannot reject the Mr. Farinas's opinions. But to do so, the ALJ must provide the reasons therefor.

Although the Court is remanding this case for the reasons stated above, it shall still address the remaining arguments made by Mr. Fox, where possible – first, because Mr. Fox has asked for a remand only as alternative relief to summary judgment and second, because the Court's statements here will give guidance to the ALJ on remand.

C.  Mr. Fox's Credibility

Mr. Fox argues next that the ALJ improperly discounted his credibility with respect to his symptom reporting. Under Ninth Circuit case law, an ALJ must have specific reasons for rejecting a claimant's complaints. *See Lester*, 81 F.3d at 834 ("For the ALJ to reject the claimant's complaints, she must provide 'specific, cogent reasons for the disbelief."). Moreover, "[u]nless there is affirmative evidence showing that the claimant is malingering, the [ALJ's] reasons for rejecting the claimant's testimony must be 'clear and convincing.'" *Id.* "[O]nce the claimant produces objective

medical evidence of an underlying impairment, an adjudicator may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain." *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991).

In the instant case, the ALJ found that Mr. Fox's allegations regarding his limitations were not totally credible. *See* AR 24. The ALJ acknowledged Mr. Fox's testimony that, even though medications helped his symptoms, he still remained paranoid, heard voices, and was prone to getting into fights. *See* AR 21, 391-94. However, the ALJ concluded that, based on the evidence of record, when Mr. Fox was "fully, medically complaint," his limitations did not bar him from performing "at least simple repetitive tasks with less than occasional interaction with the general public." AR 22-23.

Because the ALJ did not make any finding of malingering, the "clear and convincing" standard applies here. The Court finds that the ALJ's reasons for not finding Mr. Fox entirely credible were sufficiently specific as well as clear and convincing. Although Mr. Fox claimed that, even with medications, he continued to have severe symptoms, the treatment notes indicate otherwise. For example, in his treatment notes for Mr. Fox, Dr. Wilson noted, *inter alia*, that "[Mr. Fox] feels much better on his medications," that "[h]e feels stable on his current medications," and that his bipolar disorder was "in remission on medications." AR 363-68 (treatment notes from September 2003 to March 2004). Similarly, in a treatment note dated May 4, 2004, Dr. Dotson stated that Mr. Fox's bipolar disorder "appears fairly controlled on meds." AR 361; *see also* AR 355 (treatment note by Dr. Dotson, dated November 9, 2004) (stating that bipolar disorder was "improved on meds"). Mr. Fox's ability to participate in a 12-step program and in community activities such as church also demonstrated that his condition was stabilizing. *See* AR 17, 22, 359-60, 364, 366.

The Court acknowledges that there were facts before the ALJ that supported Mr. Fox's credibility regarding the severity of his symptoms. These facts could have permitted the ALJ to credit Mr. Fox's testimony. However, the issue here is only whether the ALJ had specific, clear and convincing reasons for not fully crediting Mr. Fox's testimony. The Court concludes that the ALJ did.

Mr. Fox argues that the ALJ's finding on credibility was problematic because the ALJ failed to abide by the prescriptions of SSR 96-7p. For example, Mr. Fox contends that, under the ruling, the consistency of an individual's own statements can be a strong indication of credibility, *see* SSR 96-7p, but that, in his case, the ALJ failed to "refer to the consistency between [his] testimonial and written statements." Mot. at 6. In both his testimonial statements to the ALJ and in written statements made to the Social Security Administration ("SSA") (*e.g.*, a daily activities questionnaire), Mr. Fox claimed, *inter alia*, that he continued to hear voices, had trouble getting along with people, and had difficulty following instructions. *See* AR 101-05, 390-93.

SSR 96-7p does direct an adjudicator to consider the consistency of an individual's own statements, including "statements the individual made to SSA at each prior step of the administrative review process." SSR 96-7p. However, that the ALJ did not specifically discuss in his decision Mr. Fox's written statements and their consistency with Mr. Fox's testimonial statements does not necessarily invalidate his credibility determination. As discussed above, the ALJ provided specific, clear and convincing reasons for finding Mr. Fox only partially credible. The ALJ cited evidence that contradicted Mr. Fox's both written and oral statements.

Mr. Fox also argues that the ALJ failed to comply with SSR 96-7p because the ALJ did not make a finding that Mr. Fox's mental "impairments could 'reasonably be expected to produce' any or some of the symptoms and limitations reported." Mot. at 7. However, such a finding was implicitly made as the ALJ deemed Mr. Fox partially credible. *See* AR 22-23 (stating that Mr. Fox's "[s]ubjective complaints are considered credible *only* to the extent that they are supported by the evidence of record as summarized in the text of this decision" and that Mr. Fox's "subjective complaints of mental dysfunction and limitations – if fully, medically compliant, [were] less than fully credible when compared to the record as a whole") (emphasis in original). As noted above, this Court, in reviewing the ALJ's credibility determination, is applying the more rigorous standard of review under *Lester* and *Bunnell*.

Mr. Fox asserts next that the ALJ failed to comply with SSR 96-7p because, under the ruling, in assessing an individual's credibility, an adjudicator "must consider in addition to the objective medical evidence" seven factors, namely: (1) the individual's daily activities; (2) the location,

duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p. According to Mr. Fox, the ALJ did not consider these seven factors.

Although the ALJ could have provided a more extensive written analysis of the factors outlined in SSR 96-7p, there is enough in his decision to reflect that the material factors above (some of which do not seem applicable to Mr. Fox's case) were sufficiently considered. For instance, regarding daily activities, the ALJ noted that Mr. Fox lived in a garage owned by a 55-year-old woman and that, although he isolated himself from the general public, he took care of a dog, "even walking him at night." AR 21. The ALJ also noted that Mr. Fox was active in a 12-step program and was participating in community activities such as church. *See* AR 17, 22, 359-60, 364, 366. Regarding location, duration, frequency, and intensity of symptoms, the ALJ took note of, *inter alia*, Mr. Fox's claim that, even with medications, he remained paranoid, heard voices, and was prone to getting into fights and that he had as many as eight grand mal seizures since leaving prison in early 2003. *See* AR 21. With respect to factors that precipitate and aggravate symptoms and medications taken to alleviate symptoms, the ALJ indicated that Mr. Fox's failure to take the prescribed medications – as well as his alcohol and illegal drug abuse – affected his ability to take care of himself and perform simple repetitive tasks. *See* AR 19-20, 22-23.

Finally, Mr. Fox contends that the ALJ did not comply with SSR 96-7p because the ALJ "skipped over evidence from a material category," Mot. at 7 – namely, "[s]tatements and reports from the individual and . . . other persons . . . about the individual's . . . prior work record and efforts to work." SSR 96-7p. According to Mr. Fox, "[t]he ALJ did not acknowledge that [Mr. Fox's] work history showed only short term jobs, and no sustained jobs, and jobs in which he failed." Mot. at 7. The Court does not agree. In his decision, the ALJ took note that, since Mr. Fox's alleged disability onset date, he had no substantial gainful activity, although he had done some work as a

box boy, dishwasher, and scrap steel worker. *See* AR 15; *see also* AR 84 (disability report noting a part-time job as a dishwasher for a month or two); AR 141 (a 2002 discharge summary noting that Mr. Fox "works with scrap steel"); 379-80 (Mr. Fox testifying at ALJ hearing that he "worked for a couple of weeks" as a box boy in 2000). Moreover, the ALJ specifically found that Mr. Fox had "no past relevant work." AR 23. These statements by the ALJ reflect an adequate consideration of Mr. Fox's prior work record and efforts to work.

D.      Disability Determinations and Substance Abuse

Title 20 C.F.R. § 416.935(a) provides: "If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability, unless we find that you are eligible for benefits because of your age or blindness." 20 C.F.R. § 416.935(a). According to Mr. Fox, "[t]he ALJ properly stated the law about materiality of substance abuse, but did not apply it in proper sequence" – *i.e.*, the ALJ should have considered Mr. Fox's drug addiction and alcoholism only if, *after* going through steps one through five described above, the ALJ determined that Mr. Fox was disabled. Instead, the ALJ considered the issue of drug addiction and alcoholism in determining Mr. Fox's RFC.[1] *See* AR (stating that "it is necessary to determine whether, considering only those impairments *without* the effects of substance addiction, the claimant would retain the 'residual functional capacity' for substantial gainful activity (SGA) or, in this case, simple repetitive tasks on a consistent basis") (emphasis added).

Mr. Fox is correct that, under § 416.935(a), the ALJ did not consider Mr. Fox's drug addiction and alcoholism in the proper sequence. However, this error was not prejudicial. *See Stout*, 454 F.3d at 1055 ("We have also affirmed under the rubric of harmless error where the mistake was nonprejudicial to the claimant or irrelevant to the ALJ's ultimate disability conclusion."). Even if the ALJ had found Mr. Fox to be disabled after doing the five-step analysis, there is no dispute that there was substantial medical evidence of drug addiction and alcoholism.

---

[1] As Mr. Fox points out, the ALJ confusingly stated, at the conclusion of the decision, that "a judgment regarding whether [Mr. Fox's] polysubstance/alcohol dependence disorder(s) would be a contributing factor to the determination of disability was unnecessary" because the ALJ had found him not disabled. AR 24.

This evidence would have compelled the ALJ – pursuant to § 416.935(a) – to determine whether the drug addiction or alcoholism was a contributing factor material to the determination of disability. In determining whether the drug addiction or alcoholism was a material contributing factor, the ALJ would have had to examine whether Mr. Fox would still be disabled if he stopped abusing drugs and/or alcohol – *i.e.*, the ALJ would have had to evaluate Mr. Fox's "mental limitations that formed the basis of the initial finding of disability to determine what limitations would remain if the individual stopped using drugs or alcohol and whether those limitations would be disabling." *Maldonado v. Barnhart*, No. SA-05-CA-0468 RF (NN), 2006 U.S. Dist. LEXIS 60052, at *28 (W.D. Tex. Aug. 19, 2006). In other words, the ALJ would have had to do the same exact inquiry after step five that he did in his decision, albeit at a different point (*i.e.*, in determining RFC). The Court concludes that in this case the same result – no disability – would have obtained. The bottom line is that the ALJ did make findings on this point: that absent drug addiction or alcoholism, Mr. Fox had adequate RFC so as not to be disabled. Mr. Fox was not prejudiced by any error in sequence committed by the ALJ.

E.  Disability Determinations and Compliance with Medical Treatment

Title 20 C.F.R. § 416.930 provides, in relevant part that, "[i]n order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work" and that, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or blind." 20 C.F.R. § 416.930. According to Mr. Fox, the ALJ's determination of nondisability was based in part on a conclusion that Mr. Fox was not taking his prescribed medications but the ALJ made no mention of § 416.930 or SSR 82-59 (a ruling which addresses failure to follow prescribed treatment) and furthermore failed to comply with SSR 82-59.

The fact that the ALJ did not specifically cite § 416.930 or SSR 82-59 is not dispositive. There is no dispute that a failure to follow prescribed treatment, without good reason, is a basis for a determination of no disability. As for compliance with SSR 82-59, the ruling provides that

> SSA may make a determination that an individual has failed to follow prescribed treatment only where all of the following conditions exist:

  1.  The evidence establishes that the individual's impairment precludes engaging in any substantial gainful activity (SGA) . . . ; and

  2.  The impairment has lasted or is expected to last for 12 continuous months from onset of disability or is expected to result in death; and

  3.  Treatment which is clearly expected to restore capacity to engage in any SGA (or gainful activity, as appropriate) has been prescribed by a treating source; and

  4.  The evidence of record discloses that there has been refusal to follow prescribed treatment.

SSR 82-59. Items (1) and (2) above essentially reflect the traditional five-step disability analysis.

  Mr. Fox is correct that the ALJ did not apply the law on noncompliance with treatment in the proper sequence. However, as above, the error was not prejudicial. Even if the ALJ had found Mr. Fox to be disabled after step five, he would have had to address issues (3) and (4) above – *i.e.*, whether treatment clearly expected to restore capacity to work was prescribed by a treating source and whether the evidence of record discloses refusal to follow the prescribed treatment. In his assessment of Mr. Fox's RFC, the ALJ cited substantial evidence in the record regarding the beneficial effect of treatment and Mr. Fox's decision to stop taking prescribed medication – evidence which supported (albeit in a different analytical sequence) findings on both (3) and (4). *See* AR 16-18, 22 (taking note of treatment notes of Dr. Wilson, Dr. Broderick, Dr. Aratow, Cama Garcia, P.A., and Dr. Dotson). For example, in his treatment notes for Mr. Fox, Dr. Wilson noted, *inter alia*, that "[Mr. Fox] feels much better on his medications," that "[h]e feels stable on his current medications," that his bipolar disorder was "in remission on medications," and that "[h]e feels that his medications are working well for him." AR 363-68 (treatment notes from September 2003 to March 2004). Similarly, in a treatment note dated May 4, 2004, Dr. Dotson stated that Mr. Fox's bipolar disorder "appears fairly controlled on meds." AR 361; *see also* AR 362 (treatment note by Dr. Dotson, dated April 13, 2004) ("We reviewed the fact that withouut [sic] proper medication compliance, his mood symptom will probably get him into trouble."); AR 355 (treatment note by Dr. Dotson, dated November 9, 2004) (stating that bipolar disorder was "improved on meds"). In another treatment note, dated September 7, 2004, Dr. Dotson stated that Mr. Fox was

still hearing voice and was fairly irritable but this coincided with Mr. Fox's decision to stop using zyprexa several weeks earlier. *See* AR 357. Dr. Dotson noted: "It's unclear why he suddenly decided he didn't like zyprexa as he never complained about 'nausea' before this excuse[;] sounds like he made it up." AR 357; *see also* AR 303 (emergency department note by Michael Aratow, MD, dated March 11, 2004) (noting that Mr. Fox "has been self-regulating his antipsychotic medications" and that he "stopped his Seroquel three days ago but then took 1 last night and 1 today"); AR 289 (emergency department note by Cama Garcia, PA, dated April 3, 2004) (noting that Mr. Fox "has not been taking his Dilantin three times a day, he has only been taking it once a day"); AR 362 (treatment note by Dr. Dotson, dated April 13, 2004) (noting that Mr. Fox "decided to stop seroquel due to the fact it made him feel like a 'zombie'").

The ALJ observed that Mr. Fox's anti-social and impulsive behavior improves when he is compliant with medications and abstains from alcohol and drugs, and that with that compliance, Mr. Fox "is capable of self-care and of performing simple repetitive tasks." AR 20. The ALJ found "no evidence to believe if he were abstinent from alcohol and illegal drugs and fully compliant with his prescribed medications, the claimant would suffer episodes of deterioration or decomposition while performing work-like activities." *Id.* The ALJ also found "the record reveals that the claimant has not always been fully compliant with his prescribed medications." AR 21. Ultimately, the analysis was substantially the same as that required under SSR 82-59, and thus, the ALJ's failure to adhere to the precise procedural sequence prescribed herein was not prejudicial.[2]

F. <u>RFC and Step Five</u>

Finally, Mr. Fox argues that the ALJ's findings on RFC, as well as his findings at step five, were not supported by substantial evidence. Because the Court has concluded that the ALJ erred in failing to address the opinions of Mr. Fox's parole agent, Mr. Farinas, and further that the Court cannot conclude the error was not prejudicial, the ALJ must reconsider on remand the issues of RFC and step five. In light of the remand, the Court does not, and need not address, Mr. Fox's contention that the ALJ should have taken vocational testimony at the hearing. *See Aukland v. Massanari*, 257

---

[2] The Respondent's assertion that "the ALJ did not find that Plaintiff was not compliant with his medications" (Resp. Brief at p. 7) is not accurate.

F.3d 1033, 1036 (9th Cir. 2001) ("The ALJ may rely on the grids alone to show the availability of jobs for the claimant only when the grids accurately and completely describe the claimant's abilities and limitations.") (internal quotation marks omitted); *Desrosiers v. Secretary of Health & Hum. Servs.*, 846 F.2d 573, 577 (9th Cir. 1988) ("A non-exertional impairment, if sufficiently severe, may limit the claimant's functional capacity in ways not contemplated by the guidelines. In such a case, the guidelines would be inapplicable.").

### III.     CONCLUSION

For the foregoing reasons, the Court denies both parties' motions for summary judgment but remands the case for further proceedings consistent with this order. The Clerk of the Court is directed to close the file in this case.

This order disposes of Docket Nos. 15 and 18.

IT IS SO ORDERED.

Dated: January 24, 2007

EDWARD M. CHEN
United States Magistrate Judge